I think the panel would like the appellant and appellee to first address mootness. Although we usually keep all of an argument together, in this case we thought if the appellant could take five minutes on mootness, which as I understand it relates just to one plaintiff, that might be wrong. But in any event, have the appellant address mootness for five minutes or so, and the appellee address mootness for five minutes or so, and then we'll have 15 minutes each side on the merits. But if counsel prefer to not say that much on mootness than to put it on the merits, that's okay too. We were interested in hearing about this so we know who's in the case. Yes, please, Your Court. My name is Bill Maurer. I'm with the Institute for Justice, and I represent AAPS in this case. With regard to the issue of mootness, in our briefing that we submitted, the supplemental briefing concerning this issue, we indicated that AAPS is an entity that had brought this lawsuit because they believed that the act, the Clean Elections Act, would act as a disincentive for them to engage in political advocacy. That belief, that warning, has since come true, and they have determined as an organization that they do not wish to engage in political advocacy in the State of Arizona while the act is in place. But there are some important issues and facts that counter that issue and that determination because AAPS is still an incorporated entity. They still have a presence in Arizona. And their stated intention, as demonstrated by the declaration of Ms. Orient that we submitted with our supplemental briefing, is that in the proper circumstances, they would return to political advocacy if the act was not in effect. Isn't that a statement of contingency? It's not an unequivocal statement. We're going to come back. If something comes up, we'll come back. It's not equivocal because there has to be a reason for them to return to. No, but we don't know what that reason is. Well, the reason would be that there is a candidate. We'd have to guess. It's very similar to the situation in Clark where Mr. Clark was. . . Well, that's one precedent, but we've got the Supreme Court telling us the Ninth Circuit better observe the limits on a case. You know, the Arizona, the other Arizona case. Justice Ginsburg begins that opinion. The Ninth Circuit forgot about the limits. And we'd better pay attention to them. Well, the Arizona case is actually easily distinguishable because the plaintiff in that case had left public employment and had no intention of returning. Here, we merely have AAPS sort of. . . How does that change the fact? We don't know for a certainty that you will be back. What we do know is that AAPS is interested in the political situation in the state of Arizona. That's wonderful. And that they have a . . . part of this interest is paying attention to who gets elected and who gets defeated for statewide office and other offices in the state of Arizona. So when a candidate comes about that they wish to either oppose or support using independent expenditures or other methods of political advocacy, the contingency is not are they going to get back into the field because of some action on the state of Arizona. It's whether there's an acceptable or unacceptable candidate for them to support. That's going to be a contingency regardless of the existence of the Act or not. So the distinction between the City News case and the Arizona for official English case here is that we have a plaintiff in this case that wishes to return to the playing field. They wish to come back and engage in their First Amendment right as their First Amendment in the Arizona Constitution guarantees them to do. But they have indicated that we do not wish to do that under the rules that are currently in place. And because the rules are currently in place, they have no reason to continue to file lobbying reports or to engage in the type of regulatory regime that currently exists for a PAC in the state of Arizona. I guess the question is if they want the referee to make a call, do they have to stay on the field? They do not need to stay on the field if the game is not being played to the rules that they think are fair. Right now they think the rules are not fair. And so they have basically taken their team off the field for the moment. Was that an intentional decision? Did they consult counsel when they disbanded the PAC? My understanding of what happened, Your Honor, is that they disbanded the PAC because there was a change in leadership. The new leadership did not understand why we were filing or why they were filing these reports. So they sort of blundered into it? It was a decision that, blundering may be one way to phrase it, it would be a decision that they said, Why are we taking all this time and making and expending all this energy to file these reports when we've told the Court, we've told everybody, we've told everybody in the state of Arizona, we do not wish to engage in political advocacy while the Clean Elections Act is in place? Okay. I guess that covers the allotted time. But if any judge has other questions on mootness, now we'll go forward. I'm sorry. I didn't mean to consume their time as well. No, you've covered your allotted time. Okay. All right. Thank you. Thank you, Your Honor. Thank you. Okay. And we appreciate counsel indulging us by breaking this up. So we'll hear from Appelli now on mootness. Now, is this Mr. Soland? Yes, Craig Soland for the State of Arizona. Please proceed. Let me say, proceed any way you want. All right. But at some point, be sure to let me know if, whether, if the claims of the Association of American Physicians of that organization are moot. Is it still, there's still a live controversy with regard to the other appellants? In other words, there's several parties here. There are several parties. There are candidate parties. I've assumed, so you, please let me know if I'm wrong, that I don't know whether the physicians' claims are moot yet. But assuming we decided they were, like, I've understood that would not render the whole case moot. If you're arguing it does, you better explain that. From the State's point of view, it would not render the whole case moot. It would render a distinct portion of the case moot. And that's the portion that relates to the association's arguments. Are you speaking into the microphone? I'm sorry. Is that better? That's better. That's much better. What portions of the case do you think would be rendered moot if the claims of the physicians' group? The association has argued that its constitutional rights, its First Amendment rights, are violated by the independent expenditures provision. What about the coercion? In the act. Coercion would not be rendered moot. The association hasn't made a coercion argument. The candidates have. What we're dealing with is a situation where, at the time this lawsuit was filed, the association was not registered as a PAC and had not made any independent expenditure in a state election. Could not. Two months after the case was filed, the association registered as a PAC and never made an independent expenditure. After judgment, the association voluntarily terminated its status as a PAC and can no longer make any independent expenditure in the state. So the only difference between the association and really anybody in this room is that the association, once upon a time, was qualified to make an independent expenditure and never did. Compare that to Clark, where the plaintiff had been operating three businesses and went out of business because of the ordinance that was challenged. Or compare that to the Southern Oregon case, where the fair had been operating for 18 years and then had trouble because of an ordinance. The only difference between the two is that the association,  The only difference between the two is that the fair had been operating for 18 years. Counsel said that they wanted to return to the playing field. They were never really on the playing field. They never made any independent expenditures. They were paper qualified to make independent expenditures, and now they no longer are. From the State's point of view, their claims are moot. Okay. You don't have to spend five minutes on it if you don't want to. I'll reserve it for the rest of our time. Thank you. Okay. All right. Okay. We'll proceed to the merits argument. I guess set the clock at 15 minutes. So each will have the same merits time. May it please the Court. My name is Tim Keller. I represent the appellants in this case, and I do intend to reserve this. Then stop short of using up the whole 15 minutes. I will do that, Your Honor. That would be my intention. Thank you. The challenge provisions of Arizona's so-called Clean Elections Act are unconstitutional because they allow the State to enter the playing field and put its thumb on the scale and tip the balance in favor of taxpayer-financed candidates. Consider the following three examples. Under the Act, privately-financed candidates are forced to abide by the Act's expenditure limitations in order to avoid being vastly outspent by their taxpayer-financed opponents. Second, a privately-financed candidate is actually put in a position where he or she hopes, indeed, candidate Matt Salmon said, prays that nobody comes in and makes an independent expenditure supporting their candidacy, including their own political parties, because of the matching funds provisions. Thank you. Let us speak into the microphone. Third, the Act's multiplying effects significantly drown out political speech because under the Act. You're not in the microphone. I'm sorry, Your Honor. We have tall advocates today. We're recording microphones. Under the Act's multiplying effects, the State will sometimes pay out two or more times the amount that candidates raise under the Act or that advocacy groups spend to support or defeat candidates. There are basically two overriding constitutional violations under the Act. First, it significantly discourages political discourse. And number two, it forces or punishes candidates who choose not to participate in the Clean Elections Act. First, let me explain how the Act discourages political speech. With regard to the candidate plaintiffs, on his most recent race for State Treasurer, plaintiff appellant Dean Martin faced a publicly financed opponent who had no primary opposition. The result was that his opponent received $47,000 in the primary election, $71,000 in the general election, for a total of $118,000 to spend against candidate Dean Martin. However, Dean Martin, by the time his campaign raised $71,000, the Act started to kick in matching funds. So for every dollar he would raise above $71,000, his opponent would receive a dollar-for-dollar match, meaning that she began the campaign with 40% more than he had. And the result was that he did not make any more expenditures. The U.S. Supreme Court in Buckley said that candidates should have an unfettered right to make unlimited expenditures in a campaign for office. However, as a result of the operation of the Act, he basically self-censored. He self-censored. But the statute didn't do that. Isn't that different than Buckley did? If the statute does not impose a limitation, but the limitation is self-imposed, how does Buckley control that outcome? Well, it is not a direct limitation. It is an indirect limitation. There is a very real-world consequence to a candidate spending additional dollars after he has raised the expenditure limit under the Act, and that is that for every dollar he raises, his opponent will receive a dollar. Knowing that your opponent is going to receive a cash subsidy from the state will result in speech not being made by candidates and other groups. That's exactly what the Sixth Circuit recognized in Gable v. Patton. They said that these sort of trigger provisions will, in fact, result in protected speech not being made. Second, with regard to independent expenditure groups and advocacy groups, if a group is going to go out into the marketplace and purchase an advertisement for $5,000 and they know that the state is going to basically step up to the ATM, in this case Arizona taxpayers' money, and send $5,000 to the candidate they oppose, that's going to make every advocacy group think twice before engaging in political discourse. In fact, that's exactly what's happened in Arizona in the last two statewide elections. We had an advocacy group known as Mainstream Arizona that started making independent expenditures that they thought were designed not to trigger matching funds, but the commission said that those independent expenditures did, in fact, trigger the funds, and Mainstream stopped speaking in the course of the election. The Arizona Democratic Party did the same thing in the 2002 election. And then most recently, in the 2006 election, we had both the Arizona Republican Party and the Arizona Democratic Party sending out slate mail, which they thought was going to be exempt under the act, only to find out that the commission was going to consider issuing matching funds for those ads, and they stopped spending money. There's no way to get around the real world impact of knowing that your opponent is going to receive money from the state just because you have chosen to engage in your protected right to engage in political discourse. But counsel, isn't the real goal to have uncontested speech? Isn't that the real objection? No, absolutely not. Both the candidates and the association welcome responsive speech, but there's a difference between responsive speech and knowing that because you have spoken, the candidate who you oppose is going to receive additional resources in the form of taxpayer money. But the candidates can all ‑‑ every candidate has the option of participating in the public funding scheme. Isn't that correct? Yes, any candidate could attempt to qualify for the act, but there are going to be some candidates, such as candidate Matt Salmon and Dean Martin, who are philosophically opposed to running campaigns using taxpayer dollars. They would not accept it under any conditions, and the result of them not accepting it is that the state punishes them by placing the burden of ensuring publicly funded candidates receive equal funding directly on the privately financed candidate. It's up to the candidates to file up to 37 additional trigger reports in order to ensure that the matching funds are received by their opponents. And also the fact that the matching funds are based on the gross amount raised results in incredible financial disparities in an individual race. Let me give you an example from the 2002 election with candidate Salmon. He had a fundraiser where he brought in the President of the United States. He raised $750,000 gross in that election or in that fundraising event. However, his net was $5,100. And yet because he was facing two publicly funded opponents, one a Democratic opponent and one an independent opponent, the state doled out $1.5 million in matching funds, $750,000 to each of his publicly funded opponents. That creates an unbelievable disparity between the privately financed candidate and the publicly financed candidate without taking into effect the real world impact on a candidate who eschews public dollars. Counsel, was the act as the result, did the act come about as the result of a voter initiative? Yes, Your Honor. Aren't we supposed to tread very carefully when we're being asked to overturn a voter initiative as opposed to a legislatively imposed restriction? Well, under the Arizona Constitution, when the people sit and vote as an initiative, they essentially sit as the legislature in those circumstances. And the Arizona citizenry sitting as the legislature has no more right to infringe on or violate the constitutional rights of candidates, advocacy groups, or political parties than would the legislature. Finally, actually I will reserve the rest of my time for rebuttal. Thank you. Okay, Mr. Soland. Good morning again. Could you use the mic, please? I will. Buckley v. Vallejo recognized that using public money to fund elections can reduce the influence of large contributions on the political process and furthers First Amendment values by facilitating and enlarging participation and discussion in the electoral process. Court called these values goals vital to a self-governing people. These are exactly the same purposes that drive the Arizona Clean Elections Act. It cuts the tie between money and politics, permits a wider variety of people to run for public office, and it lets candidates spend their time on the issues rather than on fundraising. Appellants argue that the act is coercive, but they never get around to applying the test for coercion. Under the cases they cite, the courts recognize states have compelling interests in attracting candidates to public funding. They state that there could come a point where a public funding statute could become coercive, although the cases haven't found it yet. Well, you may be confronting one right now. Well, hopefully not, Your Honor. I mean, if I give a dollar to you, you're my candidate, and that means that two other candidates get two dollars to say what they want, I'm coerced. I'm not going to give you a dollar. Well, under the test for coercion that the courts have adopted, not this circuit, obviously, but under the First Circuit, the Sixth Circuit, the Eighth Circuit, a public funding statute doesn't become coercive unless the benefits that a candidate gets are so overwhelming. Well, that's one test, but I think a more commonsensical test is if you generate a lot more on the other side, then you've got – and there's no allowance for your expenses. Isn't that a big problem right in itself? Why aren't the expenses allowed for? I'm sorry, Your Honor. Why aren't the expenses of fundraising subtracted from the amount raised? When you calculate – when the State calculates how much they'll give, why don't they subtract what the independent candidate has raised? Both parties – when the money comes in, when a contribution comes in to the participating candidate, participating candidate has to pay the same money for publicity and expenses. No, no. This is fundraising money I'm talking about. When he's raising money for the fundraising event, he has to pay money. Well, when – if a participating candidate wanted President Bush – Oh, no. A non-participating candidate has to pay expenses, right? If a – but if a participating candidate wanted President Bush to fly in on Air Force One, the participating candidate would have to pay the same amount. Well, but he'd get it from the State. I mean, you're just being totally unresponsive. I'm saying – you know the case that would get – $200,000 is subtracted from what was raised, but the State gives the raised amount to the other two candidates. How can that possibly be fair? Everyone – everyone that takes in a contribution spends money to bring in the contribution. But what you're really trying to bring in is publicity. The participating candidate has to spend the same money to bring in the publicity. Well, you're just not answering my question. I'm not trying to avoid your question. Well, I – go ahead. Under coercion analysis, as I said, you look at the benefits that are coming in, and you compare that against the restrictions. In this case, in order to become a clean elections candidate, candidate has to agree after the initial seed money, which has to be spent by the end of the qualifying period, has to agree to exist entirely in public funds. Candidate can't go over the candidate's base allotment unless he's up against a non-participating candidate. The non-participator goes over the base allotment. At that point, all the candidate gets are limited one-for-one matching funds. Except there were two candidates. Well, for a limited period of time. Those two candidates could be in different parties. There might be three candidates, right? You could have – you could have – So they would get one-for-one? No, it's one-for-two. Well, it could be that two are non-participating and one is participating. No, but in fact, we know of a situation where two are participating. In one situation, there was an independent, there was a Republican candidate who was non-participating, and there was a Democratic candidate who was participating. And they were all against one another. It wasn't two against one. Now, are the parties excluded from these controls? The Democratic party, the Republican party? No, if you're running – if I understand your question right, if you're running as a participating candidate, you can be running as a Republican, a Democrat, or an independent. It doesn't matter. No. I'm having difficulty communicating. Is the Democratic party able to raise money for the Democratic candidate? Yes. And that's an independent expenditure. And so you can have it be participating and have your party raising money for you. It's an Alice in Wonderland. You could have your party raising money for you, just like a non-participating candidate could have his party raising money for you. The difference is, once the matching fund period is over, the participating candidate has to sit down. Once the non-participating candidate reaches the participating candidate's funding limit, the non-participator can go out and collect contributions all day long. Participating candidate can't even reach into his own pocket, can't go out and collect a contribution. Are you explaining why this statute makes any – referendum makes any sense? If the major parties can raise money, if you're trying to keep money out of politics, they can go ahead and raise all the money they want. The major parties raise money and they make independent expenditures. Yeah. But it's not a contribution to a candidate. I know that's what the law says, but it doesn't make any sense to me. Well, under the – what the voters were trying to do – I know what the voters were trying to do. Well, how does it make sense? Well, it makes sense because if a participating candidate is up against a non-participating candidate and the non-participating candidate's party is pouring thousands and thousands of dollars into the election, then the participating candidate needs to be able to respond to that. And that's why the Act matches. But it does very – it's such a really ineffective job of keeping money out of politics, if that's the slogan it's operating under. Well, that money is not going to the candidate. So the candidate is not beholden. Well, that's a – the Democratic Party isn't spending on behalf of the Democratic candidate. Is that what we're expected to believe? It's not an individual contributor. No, no. You don't suppose that the major contributors to the party are not known to the candidate? Is that your supposition? Pardon? You don't suppose the major contributors to the party are not known to the candidate? It's – Is that your supposition? My – my – Is it? That there's an anonymity about the contributors to the party? If there are major contributors to the party, they may well be known to the candidate. Of course they'll be known. And of course that gives them access. What this Act does, though, is to prevent a situation where contributors to candidates have access, as you say. It's the same kind of purpose that – Well, it's a great purpose. I applaud the purpose. But it's so ineffective. And it does impose burdens on the right of association, on the right of free speech. It's just a very unworkable scheme. It's – if – the issue is, does it violate constitutional rights? And it clearly does not, because non-participating candidates have a choice. They can either opt in and accept the Act's funding limits or not opt in and have unlimited rights to raise money. They can take independent expenditures. They can go out to as many contributors as they want and raise money. And this cuts the tie between individual contributors and candidates. And it permits – it furthers First Amendment values by permitting people who don't have ties to big business. Anybody who was a big contributor would contribute to the party. Pardon? Anyone who was a big contributor would contribute to the party. You can have the contributors contribute to the party. The Act doesn't – I know it. You would do that. That's the way the big money would go. Well, the Act – Buckley says you can't limit independent expenditures. No, no, no. It doesn't – expenditures, but not – Buckley lets it open as to contributions. And you didn't close the door. Well, Buckley – and since we're on that, let me focus a little bit on Buckley. Because what Buckley said was that there is – that it violates First Amendment to have a limit on expenditures. Limits on expenditures restrict speech. Buckley didn't say that there's any problem with public funding of elections. Buckley said public funding of elections furthers First Amendment. I know. It all depends on the terms of the law. So we're looking at your law, which is so weak and ineffective, at the same time that it poses substantial burdens. I have to take issue with that. This law is very effective. This law is very well drafted, and it's a law – But it can run circles around you with giving money to the parties. Yes, people can give monies to parties. Well, isn't that – the big contributors will do that, will they not? It's not the same thing as somebody coming in and saying to a candidate, I gave you a large contribution. It's totally diluted. The dilution is – Diluted, not diluted. It's a dilution to think it's diluted. Let me ask you a question just to make sure I understand how this works. Let's say a candidate running for governor had not opted into the – they hadn't opted into this program, and they have an opponent of a different party that has opted in. So I assume that can happen. Yes. Now, if the candidate who is not a participant in the public funding, if their political party donates – not donates, I guess – makes an independent expenditure of a few hundred thousand dollars, elect our candidate, then state money up to three times the initial funding would be used for the opposing candidate. Could match that. That's right. Who was participating. That's right. Now, I understand that. Now let's say the opposing candidate who was participating, that their political party decides to make an independent expenditure of the same 200,000 on their behalf. I take it that could happen. Yes. And the nonparticipant doesn't get any money then. No, the nonparticipant – In that hypothetical, the nonparticipant's party and the participant's party both contribute equal amounts, but the State comes in and matches on sides. Right. Is there any problem with that? There's no problem with that. That's a benefit, the fact that the participating candidate independent expenditure isn't deducted, but you have to weigh that benefit under coercion analysis against the restrictions under the Act. Every dollar that comes in by way of matching funds puts the participating candidate one dollar closer to the funding ceiling where everything gets cut off and the candidate has to sit down until Election Day. If you didn't deduct or if you deducted these pro-participating candidate independent expenditures from the participating candidate's public budget, what you would have would be a situation where the participating candidate wouldn't be the one who's speaking. What the Act wants is to give voice to participating candidates, to a broad spectrum of candidates. You'd be turning over the matching budget to the political action committees who may have a totally different agenda, they may have a totally different message, and they may be effective, they may be ineffective, but the voice that needs to be heard is the voice of the candidate. It looks like I'm about up on my time, so I'm going to cede the rest of my time to Deborah Goldberg from the Brennan Center. I'm a short person for a short. I wanted to just address some of the concerns that you've raised about the fairness, and I think it's important to understand that the decision that needs to be made about the coerciveness of the system has to be taken from the perspective of the entirety of the fundraising capability of the two candidates. And from the entry position of the two candidates. What one looks at is the capacity of a publicly funded candidate to raise funds, and the capacity of a privately funded candidate to raise funds. That's the perspective from which the candidate makes the decision whether or not to participate. The candidates both know that their political parties can make independent expenditures. They both know that those independent expenditures will be matched in the case of a participating candidate up to the ceiling. They both know that if they do not participate, they will have the right to respond to those independent expenditures by going at themselves and raising as much money as they possibly can. From that entry position, they have a choice. They can go into the system or they can stay out of the system. If they think that they're going to be able to raise more money by staying out of the system and that their speech will be better amplified by staying out of the system, they make that choice. And in 2002, 45% of the candidates made that choice and opted out of the system, including the candidates in this case. In 2004, 66% of the candidates opted out. And in 2006, 40% of the candidates opted out. They had a choice. The purpose of this system is not to get money out of politics. That's a misunderstanding of what's going on here. The purpose of the system is, in fact, to put some money into politics. It's to put money into public money into politics for candidates who are not in a position to raise large private sums. Now, granted, the purpose is also to combat corruption, and it combats corruption to the extent that it legally can. It can control the amount of the contributions. It cannot control independent expenditures. And so Judge Newman, you are absolutely right that large contributors, to the extent that they can, will give money to political parties in Arizona. There are contribution limits on the amounts they can give to political parties, but they will give to the political parties, and there is absolutely nothing that the people of Arizona or their legislature can do to cap the independent expenditures by those political parties. But the candidates know that when they go in, and they take that into consideration. And that is the reason why there has never been a court anywhere in this country that has found a successful coercion claim. And they have considered cases precisely like this one, or very similar to this one, in Maine. Both candidates know that under certain circumstances, the public financing candidate might raise more money, or might have more money at its disposal, can't raise the money. They also know that the privately financed candidate might raise more money. In 2002, privately financed candidates outspent publicly funded candidates. Eleven participating candidates hit their spending limit. In 2004, six candidates hit their spending limit. In 2006, five candidates hit their spending limit. They take that risk when they go in as participating candidates that they might be outspent. So does the nonparticipating candidate. They decide what is rational from their perspective. And they have a choice. And that is the only question that this court needs to ask. Do they have a choice to go into the system or to stay out of the system? And it is inconceivable to me that this court is going to find that there is no choice to stay out of the system when 45 percent of the candidates actually opted out, including the candidates here. I'd also like to make just one comment, if I may, about the mootness, which I did not have an opportunity to make before. The American Association of Physicians and Surgeons, Association of American Physicians and Surgeons, AAPS, filed this lawsuit at a time when it was not entitled to make contributions because it did not have a PAC. It did not have standing to file the suit at that time. It then, after we brought this to their attention, created the PAC. The PAC was never substituted as a party in this case. The party that you have before you is still the entity that does not have a right to make independent expenditures. Even if that were just a technicality, and I don't think that it is a technicality, the PAC itself never raised a dollar. Now, they're saying that it did not spend any money because of the system, but it didn't raise any money. And it could have spent money where there are two non-participating candidates, where there's a participating candidate that already hit the maximum, or it could have spent before the matching funds even kicked in. They never supported a candidate. Before the act, they never supported a candidate. After the act, they never supported a candidate. And now they're asking this Court to keep them in the case on the speculation that they might support somebody in the future. I would submit to this Court that that is not grounds for Article III jurisdiction over this case. Okay. Thank you. Thank you. We appreciate the argument. Now, Helen reserved some time, so there you go. Let's see if I can get the microphone in the right place. First, let me address the mootness briefly. The two primary cases that we rely on, Clark v. City of Lakewood and South Oregon Border Fair, both post-date the Arizonans for Official English case relied on by the state. That's a 1997 case. Our two cases are 2001 and 2003. But let me use that as a segue because there's an issue as to whether or not the specific matching funds provision that the Association is challenging, whether or not that's also being challenged by the candidates. And our position would be that it is, in fact, being challenged by the candidates. The Association challenges ARS 16-952C, saying that it infringes their rights to free speech. However, the candidates also claim that that exact same provision, ARS 16-952C, is part of the overall scheme that punishes them for not participating in the program. And in the most recent election, candidate Salmon, who was a privately financed candidate facing a taxpayer-financed opponent, experienced the severe pain that comes as a result of that particular provision. What's your answer to the statement that it can't be very coercive if almost half the candidates don't go in? Your Honor, simply because some candidates stand on principle and refuse to take political welfare does not mean that the system on its face is not inherently coercive or doesn't force candidates to participate by either accepting expenditure limits, even if they're privately financed, or by punishing them for refusing to do so. But almost half the candidates? That's not some candidates. That's a significant percentage. Yes, Your Honor, that is the correct percentage. Doesn't that negate? Doesn't that militate against the finding of coercion if that many people feel free to opt out? Your Honor, I think the real story here is found at the statewide level, where the vast majority of candidates accept or take the public financing. In the 2000 election, only three out of 18 candidates refused to accept public funding. Mr. Salmon was one of those individuals. And during that election, what we saw was that the Arizona Democratic Party spent $1 million in independent expenditures in support of their candidate, none of which applied to her ultimate expenditure limit. So there was an additional $1 million in her benefit. But when the Arizona Republican Party responded in kind with $300,000 of independent expenditures, the state immediately matched that $300,000 to his publicly financed Democratic opponent. The only compelling interest that has been identified by the U.S. Supreme Court to infringe speech in a political context is to combat actual corruption or the appearance of corruption. It's a debatable point whether or not the state has a compelling interest in encouraging or offering benefits to individuals to participate in this type of public financing scheme. But what we do know is that while the states may be able to offer incentives, they can't go so far as to actually punish candidates who refuse to accept political welfare. The part becomes at what juncture, you know, does the scheme constitute punishment. That's the critical point here. And there is no case that guides us in that arena because no case has found coercion. So how do we make that determination that it's gone into the realm of punishment? The fact that so much speech has been discouraged in the last two statewide election cycles demonstrates that the Act is in fact coercing candidates to abide by expenditure limits and for parties to not engage when there's a privately financed candidate who's facing a publicly financed opponent. So if you were writing the opinion in this case, what would the holding be? Well, in this case, we're up on a motion to dismiss. And, you know, what the plaintiffs' appellants are asking is that the decision below, the order of vacating or dismissing the complaint be dismissed or vacated and remanded for further procedure. How would the reasoning be articulated? The fact that the Act, because under the Act the state creates reasons for individuals not to participate is a per se violation of the First Amendment and must be struck down because there's no compelling interest in suppressing that speech. And what case authority would we cite to support that holding? You can cite Buckley. You can cite the Sixth Circuit's decision in Gable v. Patton. You can cite the Eighth Circuit's reasoning in Day, all three of those decisions. Your Honor, the state should not establish public financing schemes under which only the foolish, the independently wealthy, or the hopelessly principled run privately financed campaigns. We ask, again, that the decision below be vacated and the case remanded for further proceedings. Thank you. Thank you. Today's American Physicians case shall be submitted. Again, we thank counsel for their fine art. We will take a 10 to 15 minute recess.
judges: Noonan, Gould, Rawlinson